Robert C. KONOP, Plaintiff–Appellant,

v.

HAWAIIAN AIRLINES, INC.,
Defendant–Appellee.

No. 99–55106.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 2000.

Filed Jan. 8, 2001.

Opinion Withdrawn Aug. 28, 2001.

Filed Aug. 23, 2002.

Robert C. Konop, Pro se, Playa del Rey, CA, plaintiff-appellant.

Marianne Shipp, Gibson, Dunn & Crutcher, Irvine, CA, for the defendant-appellee.

Before BOOCHEVER, REINHARDT, and PAEZ, Circuit Judges.

Opinion by Judge BOOCHEVER; Partial Concurrence and Partial Dissent by Judge REINHARDT.

## OPINION

BOOCHEVER, Circuit Judge.

Robert Konop brought suit against his employer, Hawaiian Airlines, Inc. ("Hawaiian"), alleging that Hawaiian viewed Konop's secure website without authorization, disclosed the contents of that website, and took other related actions in violation of the federal Wiretap Act, the Stored Communications Act, and the Railway Labor Act. Konop also alleged several state tort claims. The district court granted summary judgment against Konop on all claims, except his retaliation claim under the Railway Labor Act. On the retaliation claim, the district court entered judgment against Konop following a bench trial. Konop appeals the district court's judgement on all claims, except on those brought under state tort law.

On January 8, 2001, we issued an opinion, reversing the district court's decision on Konop's claims under the Wiretap Act and the Stored Communications Act, and on several of his claims under the Railway Labor Act. *Konop v. Hawaiian Airlines, Inc.*, 236 F.3d 1035 (9th Cir.2001). Hawaiian filed a petition for rehearing, which became moot when we withdrew our previous opinion. *Konop v. Hawaiian Airlines, Inc.*, 262 F.3d 972 (9th Cir.2001). We now affirm the judgment of the district court with respect to Konop's Wiretap Act claims and his retaliation claim under the Railway Labor Act. We reverse the district court's judgment with respect to Konop's claims under the Stored Communications Act and his remaining claims under the Railway Labor Act.

### FACTS

Konop, a pilot for Hawaiian, created and maintained a website where he posted bulletins critical of his employer, its officers, and the incumbent union, Air Line Pilots Association ("ALPA"). Many of those criticisms related to Konop's opposition to labor concessions which Hawaiian sought from ALPA. Because ALPA supported the concessions, Konop, via his website, encouraged Hawaiian employees to consider alternative union representation.

Konop controlled access to his website by requiring visitors to log in with a user name and password. He created a list of people, mostly pilots and other employees of Hawaiian, who were eligible to access the website. Pilots Gene Wong and James Gardner were included on this list. Konop programmed the website to allow access when a person entered the name of an eligible person, created a password, and clicked the "SUBMIT" button on the

screen, indicating acceptance of the terms and conditions of use. These terms and conditions prohibited any member of Hawaiian's management from viewing the website and prohibited users from disclosing the website's contents to anyone else.

In December 1995, Hawaiian vice president James Davis asked Wong for permission to use Wong's name to access Konop's website. Wong agreed. Davis claimed he was concerned about untruthful allegations that he believed Konop was making on the website. Wong had not previously logged into the website to create an account. When Davis accessed the website using Wong's name, he presumably typed in Wong's name, created a password, and clicked the "SUBMIT" button indicating acceptance of the terms and conditions.

Later that day, Konop received a call from the union chairman of ALPA, Reno Morella.[1] Morella told Konop that Hawaiian president Bruce Nobles had contacted him regarding the contents of Konop's website. Morella related that Nobles was upset by Konop's accusations that Nobles was suspected of fraud and by other disparaging statements published on the website. From this conversation with Morella, Konop believed Nobles had obtained the contents of his website and was threatening to sue Konop for defamation based on statements contained on the website.

After speaking with Morella, Konop took his website offline for the remainder of the day. He placed it back online the next morning, however, without knowing how Nobles had obtained the information discussed in the phone call. Konop claims to have learned only later from the examination of system logs that Davis had accessed the website using Wong's name.

In the meantime, Davis continued to view the website using Wong's name. Later, Davis also logged in with the name of another pilot, Gardner, who had similarly consented to Davis' use of his name. Through April 1996, Konop claims that his records indicate that Davis logged in over twenty times as Wong, and that Gardner or Davis logged in at least fourteen more times as Gardner.

Konop filed suit alleging claims under the federal Wiretap Act, the Stored Communications Act, the Railway Labor Act, and state tort law, arising from Davis' viewing and use of Konop's secure website. Konop also alleged that Hawaiian placed him on medical suspension in retaliation for his opposition to the proposed labor concessions, in violation of the Railway Labor Act. The district court granted summary judgment to Hawaiian on all but the retaliatory suspension claim, and entered judgment against Konop on that claim after a short bench trial.

Konop appeals, arguing that the district court erred in granting summary judgment to Hawaiian on his federal claims under the Wiretap Act, Stored Communications Act, and Railway Labor Act. In addition, Konop urges us to reverse the district court's judgment on the retaliation claim following the bench trial, because he claims the district court improperly quashed subpoenas for witnesses Konop sought to have testify at trial.

## DISCUSSION

The district court's grant of summary judgment is reviewed de novo. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). Viewing the evidence in the light most favorable to Konop, we must determine whether there are any genuine

---

1. The parties dispute the date and substance of this phone conversation. Because the district court granted summary judgment, we view the facts in the light most favorable to Konop.

issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## I. Electronic Communications Privacy Act Claims

We first turn to the difficult task of determining whether Hawaiian violated either the Wiretap Act, 18 U.S.C. §§ 2510–2522 (2000) or the Stored Communications Act, 18 U.S.C. §§ 2701–2711 (2000),[2] when Davis accessed Konop's secure website. In 1986, Congress passed the Electronic Communications Privacy Act (ECPA), Pub.L. No. 99–508, 100 Stat. 1848, which was intended to afford privacy protection to electronic communications. Title I of the ECPA amended the federal Wiretap Act, which previously addressed only wire and oral communications, to "address[ ] the interception of . . . electronic communications." S.Rep. No. 99–541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557. Title II of the ECPA created the Stored Communications Act (SCA), which was designed to "address[ ] access to stored wire and electronic communications and transactional records." *Id.*

As we have previously observed, the intersection of these two statutes "is a complex, often convoluted, area of the law." *United States v. Smith,* 155 F.3d 1051, 1055 (9th Cir.1998). In the present case, the difficulty is compounded by the fact that the ECPA was written prior to the advent of the Internet and the World Wide Web. As a result, the existing statutory framework is ill-suited to address modern forms of communication like Konop's secure website. Courts have struggled to analyze problems involving modern technology within the confines of this statutory framework, often with unsatisfying results. *See. e.g.,* Robert A. Pikowsky, *Legal and Technological Issues Surrounding Privacy of Attorney Client Communication Via Email,* Advocate, Oct. 2000, at 17–19 (discussing the uncertainty over email privacy caused by the ECPA and judicial interpretations thereof); Lieutenant Colonel LeEllen Coacher, *Permitting Systems Protection Monitoring: When the Government Can Look and What It Can See,* 46 A.F. L.Rev. 155, 171–74 (1999) (same); Tatsuya Akamine, Note, *Proposal for a Fair Statutory Interpretation: E-mail Stored in a Service Provider Computer Is Subject to an Interception Under the Federal Wiretap Act,* 7 J.L. Pol'y 519, 521–29, 561–68 (1999) (criticizing the judiciary's interpretation of the ECPA). We observe that until Congress brings the laws in line with modern technology, protection of the Internet and websites such as Konop's will remain a confusing and uncertain area of the law.

### A. The Internet and Secure Websites

The Internet is an international network of interconnected computers that allows millions of people to communicate and exchange information. *See Reno v. ACLU,* 521 U.S. 844, 849–50, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *In re DoubleClick Inc. Privacy Litig.,* 154 F.Supp.2d 497, 501 (S.D.N.Y.2001). The World Wide Web, the best known category of communication over the Internet, consists of a vast number of electronic documents stored in different computers all over the world. *Reno v. ACLU,* 521 U.S. at 852, 117 S.Ct. 2329. Any person or organization with a computer connected to the Internet can "publish" information on the Web in the form of a "web page" or "website." *See id.* at 853 & n. 9, 95 S.Ct. 2051. A website consists of electronic information stored by a hosting service computer or "server." The owner

---

**2.** The Wiretap Act and SCA have since been amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act), Pub.L. No. 107–56, 115 Stat. 272 (October 26, 2001).

of the website may pay a fee for this service. Each website has a unique domain name or web address (*e.g.*, Amazon.com or Lycos.com), which corresponds to a specific location within the server where the electronic information comprising the website is stored. A person who wishes to view the website types the domain name into a computer connected to the Internet. This is essentially a request to the server to make an electronic copy of the website (or at least the first page or "home page") and send it to the user's computer. After this electronic information reaches the user's computer, it is downloaded for viewing on the user's screen. *See generally* Preston Gralla, *How the Internet Works* (1999).

While most websites are public, many, such as Konop's, are restricted. For instance, some websites are password-protected, require a social security number, or require the user to purchase access by entering a credit card number. *See Reno*, 521 U.S. at 852–53, 856, 117 S.Ct. 2329. The legislative history of the ECPA suggests that Congress wanted to protect electronic communications that are config-

ured to be private, such as email and private electronic bulletin boards. *See* S.Rep. No. 99–541, at 35–36, 1986 U.S.C.C.A.N. at 3599 ("This provision [the SCA] addresses the growing problem of unauthorized persons deliberately gaining access to ... electronic or wire communications that are not intended to be available to the public."); H.R.Rep. No. 99–647 at 41, 62–63 (1986) (describing the Committee's understanding that the configuration of the electronic communications system would determine whether or not an electronic communication was readily accessible to the public). The nature of the Internet, however, is such that if a user enters the appropriate information (password, social security number, etc.), it is nearly impossible to verify the true identity of that user. *Cf. Reno*, 521 U.S. at 855–56, 117 S.Ct. 2329 (discussing the difficulty of verifying the age of a website user by requiring a credit card number or password).

We are confronted with such a situation here. Although Konop took certain steps to restrict the access of Davis and other managers to the website,[3] Davis was nev-

---

3. Specifically, Konop configured the website to allow access when a person typed in the correct web address, received the home page of his website, entered the name of an eligible person, created a password, and clicked the "SUBMIT" button indicating acceptance of the terms and conditions of use. In addition, Konop displayed the following language on the home page of his website:

> This is the gateway for NEWS UPDATES and EDITORIAL COMMENTS directed only toward Hawaiian Air's pilots and other employees, not including HAL management. By entering, you acknowledge and agree to the terms and conditions of use as specified below. You must read this entire page before entry. Others should s imply find *something else* to do with their time. If you are already a registered user, you may fill in your name along with the other information required below, then enter the system. If you want to visit the system, and you belong to the authorized group, you

must supply the proper information before you will be allowed to enter. Make note of the password you enter for your first visit, otherwise future visits may be delayed. Visits by others will be strictly prohibited.

Beneath this language, Konop provided boxes for a person's name, occupation, email address and password. Below the boxes were two buttons: one said "SUBMIT," the other said "CLEAR." The advisement continued:

> All name and contact information will be kept strictly confidential. Any effort to defeat, compromise or violate the security of this website will be prosecuted to the fullest extent of the law.
> WARNING!
> The information contained herein is CONFIDENTIAL, and it is not intended for public dissemination! By requesting entry in the system, you must agree not to furnish any of the information contained herein to any other person or for any other use. Re-

ertheless able to access the website by entering the correct information, which was freely provided to Davis by individuals who were eligible to view the website.

## B. Wiretap Act

Konop argues that Davis' conduct constitutes an interception of an electronic communication in violation of the

Wiretap Act. The Wiretap Act makes it an offense to "intentionally intercept[ ] . . . any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). We must therefore determine whether Konop's website is an "electronic communication" and, if so, whether Davis "intercepted" that communication.

■ An "electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system." *Id.* § 2510(12). As discussed above, website owners such as Konop transmit electronic documents to servers, where the documents are stored. If a user wishes to view the website, the user requests that the server transmit a copy of the document to the user's computer. When the server sends the document to the user's computer for viewing, a transfer of information from the website owner to the user has occurred. Although the website owner's document does not go directly or immediately to the user, once a user accesses a website, information is transferred from the website owner to the user via one of the specified mediums. We therefore con-

clude that Konop's website fits the definition of "electronic communication."

The Wiretap Act, however, prohibits only "interceptions" of electronic communications. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4). Standing alone, this definition would seem to suggest that an individual "intercepts" an electronic communication merely by "acquiring" its contents, regardless of when or under what circumstances the acquisition occurs. Courts, however, have clarified that Congress intended a narrower definition of "intercept" with regard to electronic communications.

In *Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457 (5th Cir.1994), the Fifth Circuit held that the government's acquisition of email messages stored on an electronic bulletin board system, but not yet retrieved by the intended recipients, was not an "interception" under the Wiretap Act. The court observed that, prior to the enactment of the ECPA, the word "intercept" had been interpreted to mean the acquisition of a communication contemporaneous with transmission. *Id.* at 460 (citing *United States v. Turk*, 526 F.2d 654, 658 (5th Cir.1976)). The court further observed that Congress, in passing the ECPA, intended to retain the previous definition of "intercept" with respect to wire and oral communications,[4] while amending the Wiretap Act to cover interceptions of electronic communications. *See Steve Jackson Games*, 36 F.3d at 462; S.Rep. No. 99–541, at 13;

publication or redistribution of this information to any other person is strictly prohibited. Anyone found to disseminate this information to anyone other than those specifically named and allowed here will be banned from this website and held liable to prosecution for violation of the terms and

conditions of use and for violation of this contract.

4. Congress revised the definition of "intercept" slightly to clarify that non-voice portions of wire communications are also protected. *See* H.R.Rep. No. 99–647, at 34.

H.R.Rep. No. 99–647, at 34. The court reasoned, however, that the word "intercept" could not describe the exact same conduct with respect to wire and electronic communications, because wire and electronic communications were defined differently in the statute. Specifically, the term "wire communication" was defined to include storage of the communication, while "electronic communication" was not.[5] The court concluded that this textual difference evidenced Congress' understanding that, although one could "intercept" a *wire* communication in storage, one could not "intercept" an *electronic* communication in storage:

> Critical to the issue before us is the fact that, unlike the definition of "wire communication," the definition of "electronic communication" does not include electronic storage of such communications.... Congress' use of the word "transfer" in the definition of "electronic communication," and its omission in that definition of the phrase "any electronic storage of such communication" ... reflects that Congress did not intend for "intercept" to apply to "electronic communications" when those communications are in "electronic storage."

*Steve Jackson Games*, 36 F.3d at 461–62; *Wesley Coll. v. Pitts*, 974 F.Supp. 375, 386 (D.Del.1997) ("[B]y including the electronic storage of wire communications within the definition of such communications but declining to do the same for electronic communications ... Congress sufficiently evinced its intent to make acquisitions of electronic communications unlawful under the Wiretap Act only if they occur contemporaneously with their transmissions."), *aff'd*, 172 F.3d 861 (3d Cir.1998); *United States v. Reyes*, 922 F.Supp. 818, 836 (S.D.N.Y.1996) ("Taken together, the definitions thus imply a requirement that the acquisition of[electronic communications] be simultaneous with the original transmission of the data."); *Bohach v. City of Reno*, 932 F.Supp. 1232, 1236–37 (D.Nev. 1996) (requiring acquisition during transmission). The *Steve Jackson* Court further noted that the ECPA was deliberately structured to afford electronic communications *in storage* less protection than other forms of communication. *See Steve Jackson Games*, 36 F.3d at 462–64.

The Ninth Circuit endorsed the reasoning of *Steve Jackson Games* in *United States v. Smith*, 155 F.3d at 1051. The question presented in *Smith* was whether the Wiretap Act covered wire communications in storage, such as voice mail messages, or just wire communications in transmission, such as ongoing telephone conversations. Relying on the same textual distinction as the Fifth Circuit in *Steve Jackson Games*, we concluded that wire communications in storage could be "intercepted" under the Wiretap Act. We found that Congress' inclusion of storage in the definition of "wire communication" militated in favor of a broad definition of the term "intercept" with respect to wire communications, one that included acquisition of a communication subsequent to transmission. We further observed that, *with respect to wire communications only*, the prior definition of "intercept"—acquisition contemporaneous with transmission—had been overruled by the ECPA. *Smith*, 155 F.3d at 1057 n. 11. On the other hand, we suggested that the narrower definition of "intercept" was still appropriate with regard to electronic communications:

---

**5.** Until October 2001, "wire communication" was defined as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable or other like connection between the point of origin and the point of reception ... and *such term includes any electronic storage of such communication* ...." 18 U.S.C. § 2510(1) (2000) (emphasis added).

[I]n cases concerning "electronic communications"—the definition of which specifically includes "transfers" and specifically excludes "storage"—the "narrow" definition of "intercept" fits like a glove; it is natural to except non-contemporaneous retrievals from the scope of the Wiretap Act. In fact, a number of courts adopting the narrow interpretation of "interception" have specifically premised their decisions to do so on the distinction between § 2510's definitions of wire and electronic communications.

Smith, 155 F.3d at 1057 (citations and alterations omitted).

We agree with the *Steve Jackson* and *Smith* courts that the narrow definition of "intercept" applies to electronic communications. Notably, Congress has since amended the Wiretap Act to eliminate storage from the definition of wire communication, see USA PATRIOT Act § 209, 115 Stat. at 283, such that the textual distinction relied upon by the *Steve Jackson* and *Smith* courts no longer exists. This change, however, supports the analysis of those cases. By eliminating storage from the definition of wire communication, Congress essentially reinstated the pre-ECPA definition of "intercept"—acquisition contemporaneous with transmission-

with respect to wire communications. *See Smith*, 155 F.3d at 1057 n. 11. The purpose of the recent amendment was to reduce protection of voice mail messages to the lower level of protection provided other electronically stored communications. *See* H.R. Rep. 107–236(I), at 158–59 (2001). When Congress passed the USA PATRIOT Act, it was aware of the narrow definition courts had given the term "intercept" with respect to electronic communications, but chose not to change or modify that definition. To the contrary, it modified the statute to make that definition applicable to voice mail messages as well. Congress, therefore, accepted and implicitly approved the judicial definition of "intercept" as acquisition contemporaneous with transmission.

■ We therefore hold that for a website such as Konop's to be "intercepted" in violation of the Wiretap Act, it must be acquired during transmission, not while it is in electronic storage.[6] This conclusion is consistent with the ordinary meaning of "intercept," which is "to stop, seize, or interrupt in progress or course before arrival." *Webster's Ninth New Collegiate Dictionary* 630 (1985). More importantly, it is consistent with the structure of the ECPA, which created the SCA for the

---

**6.** The dissent, amici, and several law review articles argue that the term "intercept" must apply to electronic communications in storage because storage is a necessary incident to the transmission of electronic communications. *See, e.g.,* Akamine, *supra*, at 561–65; Jarrod J. White, *E–Mail@Work.Com: Employer Monitoring of Employee E–Mail*, 48 Ala. L.Rev. 1079, 1083 (1997). Email and other electronic communications are stored at various junctures in various computers between the time the sender types the message and the recipient reads it. In addition, the transmission time of email is very short because it travels across the wires at the speed of light. It is therefore argued that if the term "intercept" does not apply to the *en route* storage of electronic communications,

the Wiretap Act's prohibition against "intercepting" electronic communications would have virtually no effect. While this argument is not without appeal, the language and structure of the ECPA demonstrate that Congress considered and rejected this argument. Congress defined "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," 18 U.S.C. § 2510(17)(A), indicating that Congress understood that electronic storage was an inherent part of electronic communication. Nevertheless, as discussed above, Congress chose to afford stored electronic communications less protection than other forms of communication.

express purpose of addressing "access to *stored* ... electronic communications and transactional records." S.Rep. No. 99–541 at 3 (emphasis added). The level of protection provided stored communications under the SCA is considerably less than that provided communications covered by the Wiretap Act. Section 2703(a) of the SCA details the procedures law enforcement must follow to access the contents of stored electronic communications, but these procedures are considerably less burdensome and less restrictive than those required to obtain a wiretap order under the Wiretap Act. *See Steve Jackson Games*, 36 F.3d at 463. Thus, if Konop's position were correct and acquisition of a stored electronic communication were an interception under the Wiretap Act, the government would have to comply with the more burdensome, more restrictive procedures of the Wiretap Act to do exactly what Congress apparently authorized it to do under the less burdensome procedures of the SCA. Congress could not have intended this result. As the Fifth Circuit recognized in *Steve Jackson Games*, "it is most unlikely that Congress intended to require law enforcement officers to satisfy the more stringent requirements for an intercept in order to gain access to the contents of stored electronic communications." *Id.; see also Wesley Coll.*, 974 F.Supp. at 388 (same).

■ Because we conclude that Davis' conduct did not constitute an "intercep-

tion" of an electronic communication in violation of the Wiretap Act, we affirm the district court's grant of summary judgment against Konop on his Wiretap Act claims.[7]

### C. Stored Communications Act

Konop also argues that, by viewing his secure website, Davis accessed a stored electronic communication without authorization in violation of the SCA. The SCA makes it an offense to "intentionally access[ ] without authorization a facility through which an electronic communication service is provided ... and thereby obtain[ ] ... access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a)(1). The SCA excepts from liability, however, "conduct authorized ... by a user of that service with respect to a communication of or intended for that user." 18 U.S.C. § 2701(c)(2). The district court found that the exception in § 2701(c)(2) applied because Wong and Gardner consented to Davis' use of Konop's website. It therefore granted summary judgment to Hawaiian on the SCA claim.

The parties agree that the relevant "electronic communications service" is Konop's website, and that the website was in "electronic storage." In addition, for the purposes of this opinion, we accept the parties' assumption that Davis' conduct constituted "access without authorization"[8]

---

7. Konop also claims that Hawaiian violated the Wiretap Act when Davis used and disclosed the contents of Konop's website. As there was no interception under the Wiretap Act, this claim also fails.

8. The term "without authorization" is not defined in the statute. *Cf. EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581–82 & n. 10 (1st Cir.2001) (explaining, with respect to alleged unauthorized use of a website, Congress' failure to define "without authorization" in the Computer Fraud and Abuse Act,

and discussing some possible, practicable definitions of the term). There is some indication in the legislative history that Congress intended the configuration of the electronic communication system to "establish an objective standard [for] determining whether a system receives privacy protection." H.R.Rep. No. 99–647, at 41. Since the issue is not properly before us, however, we express no opinion on how the term "without authorization" should be defined with respect to a non-public website such as Konop's.

to "a facility through which an electronic communication service is provided."

We therefore address only the narrow question of whether the district court properly found Hawaiian exempt from liability under § 2701(c)(2). Section 2701(c)(2) allows a person to authorize a third party's access to an electronic communication if the person is 1) a "user" of the "service" and 2) the communication is "of or intended for that user." *See* 18 U.S.C. § 2701(c)(2). A "user" is "any person or entity who—(A) uses an electronic communications service; and (B) is duly authorized by the provider of such service to engage in such use." 18 U.S.C. § 2510(13).

The district court concluded that Wong and Gardner had the authority under § 2701(c)(2) to consent to Davis' use of the website because Konop put Wong and Gardner on the list of eligible users. This conclusion is consistent with other parts of the Wiretap Act and the SCA which allow intended recipients of wire and electronic communications to authorize third parties to access those communications.[9] In addition, there is some indication in the legislative history that Congress believed "addressees" or "intended recipients" of electronic communications would have the authority under the SCA to allow third parties access to those communications. *See* H.R.Rep. No. 99–647, at 66–67 (explaining that "an addressee [of an electronic communication] may consent to the disclosure of a communication to any other person" and that "[a] person may be an 'intended recipient' of a communication . . . even if he is not individually identified by name or otherwise").

Nevertheless, the plain language of § 2701(c)(2) indicates that only a "user" of the service can authorize a third party's access to the communication. The statute defines "user" as one who 1) *uses* the service and 2) is duly authorized to do so. Because the statutory language is unambiguous, it must control our construction of the statute, notwithstanding the legislative history. *See United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir.1999). The statute does not define the word "use," so we apply the ordinary definition, which is "to put into action or service, avail oneself of, employ." *Webster's* at 1299; *see Daas*, 198 F.3d at 1174 ("If the statute uses a term which it does not define, the court gives that term its ordinary meaning.").

Based on the common definition of the word "use," we cannot find any evidence in the record that Wong ever used Konop's website. There is some evidence, however, that Gardner may have used the website, but it is unclear when that use occurred. At any rate, the district court did not make any findings on whether Wong and Gardner actually used Konop's website—it simply assumed that Wong and Gardner, by virtue of being eligible to view the website, could authorize Davis' access. The problem with this approach is that it essentially reads the "user" requirement out of § 2701(c)(2). Taking the facts in the light most favorable to Konop, we must assume that neither Wong nor Gardner was a "user" of the website at the time he authorized Davis to view it. We therefore reverse the district court's grant of summary judgment to Hawaiian on Konop's SCA claim.

---

**9.** For instance, § 2702(b)(1) permits service providers to divulge the contents of stored communications "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." *See also id.* § 2702(b)(3) (providing a similar exception with respect to remote computing services). Similarly, the "consent" exception to the Wiretap Act allows one party to a wire communication to authorize a third party to intercept the communication. *See* 18 U.S.C. § 2511(2)(c) & (d).

## II. Railway Labor Act Claims

Konop also appeals the district court's grant of summary judgment to Hawaiian on his claims under the Railway Labor Act, 45 U.S.C. §§ 151–188 ("RLA"). The RLA prohibits "interference, influence, or coercion by either party over the designation of representatives by the other." 45 U.S.C. § 152 (Third). It also declares that "it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining. . . ." *Id.* at § 152 (Fourth).

Konop asserts three claims under 45 U.S.C. § 152 (Third) and (Fourth) of the RLA. First, Konop alleges that Hawaiian interfered with his organizing efforts by accessing his website under false pretenses. Second, Konop alleges that Hawaiian wrongfully assisted a labor group by disclosing the contents of Konop's website to a union leader who supported the concessionary contract. Third, Konop alleges that Hawaiian engaged in coercion and intimidation by threatening to file a defamation suit against Konop based on statements on the website. The district court dismissed these claims on the alternative grounds that it lacked jurisdiction over the RLA claims, and that Konop failed to support them with evidence sufficient to withstand summary judgment.

### A. Subject Matter Jurisdiction

 Federal courts lack subject matter jurisdiction over disputes which are "grounded in the [collective bargaining agreement]," *Haw. Airlines, Inc. v. Norris*, 512 U.S. 246, 256, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), and "involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation," *id.* at 253, 114 S.Ct. 2239 (internal quotation marks omitted).

Such disputes, labeled "minor" disputes under the RLA, are subject to mandatory arbitration. *Id.* Hawaiian argues, and the district court agreed, that Konop's RLA claims are grounded in the collective bargaining agreement ("CBA") and are therefore subject to mandatory arbitration. We disagree.

In *Fennessy v. Southwest Airlines*, 91 F.3d 1359 (9th Cir.1996), we addressed whether the district court had jurisdiction over the plaintiff's statutory claim under the RLA. The plaintiff in *Fennessy* alleged that the carrier violated 45 U.S.C. § 152 (Fourth) by terminating his employment in retaliation for his efforts to replace the existing union. *Id.* at 1360–61. We held that "because his claim is based on a statutory provision rather than on the collective bargaining contract, it is not a minor dispute that must be brought to [arbitration]; it is a statutory claim that he may bring directly in district court." *Id.* at 1362. The plaintiff's unsuccessful arbitration of a related contractual claim under the CBA did not alter this conclusion. Because the statutory claims were not "grounded in the collective-bargaining agreement," and the statutory rights were "independent of the CBA," we found the district court had jurisdiction. *Id.*

Hawaiian argues that, unlike the statutory claim in *Fennessy*, Konop's statutory claims are grounded in and dependent on the CBA. To support this position, Hawaiian focuses on conduct which Konop explicitly alleged in his complaint as violating the CBA. Specifically, in the RLA section of the complaint, Konop alleged that Hawaiian violated the CBA by suspending him from work, reducing his employee benefits, requiring him to submit to physical and psychological testing, and giving certain pilots paid opportunities to campaign in favor of the concessionary contract.

On appeal, however, Konop does not challenge the district court's dismissal of these CBA-related claims. Rather, he objects to the district court's dismissal of his independent RLA claims. Konop claims that Hawaiian violated the RLA by (1) accessing his website under false pretenses, (2) disclosing the website's contents to the rival union faction, and (3) threatening to sue Konop for defamation based on statements on the website. Hawaiian never explains how these RLA claims are grounded in the CBA, except to say that Konop merely presents them as a precursor to the alleged CBA violations. Nothing, however, requires such a narrow reading of Konop's allegations. Konop, like the plaintiff in *Fennessy,* presents his statutory claims as independent violations of the RLA. These claims in no way depend upon a finding that Hawaiian, at some later time, violated Konop's contractual rights under the CBA.

Accordingly, we hold that the RLA claims which Konop presses on appeal are not grounded in the CBA, are not subject to mandatory arbitration and, therefore, fall within the court's jurisdiction.

### B. Protected Activity

Hawaiian contends that even if Hawaiian managers accessed Konop's website under false pretenses, conveyed this information to a rival union leader, and threatened to sue Konop for defamation, such conduct did not violate the RLA because it did not interfere with any protected organizing activity. The organizing activity in which Konop engaged principally involved the publication of articles on a secure website. As discussed above, Konop limited access to pilots and other employees on the eligi-

ble list and prohibited users from disclosing the contents of the website to others. He also categorically excluded managers. Konop's website publication vigorously criticized Hawaiian management and its proposal for wage concessions in the existing collective bargaining agreement. Because the incumbent union, ALPA, supported the concessionary contract, Konop sought to encourage consideration of alternative union representation.

■■■■■■ There is no dispute that Konop's website publication would ordinarily constitute protected union organizing activity under the RLA. Hawaiian argues, however, that Konop forfeited any protection he would otherwise enjoy because his articles contained malicious, defamatory and insulting material known to be false. In *Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53, 61, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the Supreme Court held that a party forfeits his protection under the National Labor Relations Act (NLRA) by "circulating defamatory or insulting material known to be false." [10] *See also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 282–83, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *San Antonio Comm. Hosp. v. S. Cal. Dist. Council of Carpenters,* 125 F.3d 1230, 1237 (9th Cir.1997).

We assume Hawaiian is referring to the alleged defamatory statements contained in the "Facts" section of its brief. There, Hawaiian indicates that Konop published the following false statements: (1) Nobles does his "dirty work ... like the Nazis during World War II"; (2) "Soviet Negotiating Style Essential to Nobles Plan!"; (3) Nobles is "one incompetent at the top"; (4)

---

10. While employers covered under the RLA are not subject to the provisions of the NLRA, courts look to the NLRA and the cases interpreting it for guidance. *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). We see no reason why the rule announced in *Linn,* 383 U.S. at 61, 86 S.Ct. 657, regarding protected activities, should not apply in the context of the RLA.

Nobles "has little skill and little ability with people.... In fact, with as few skills as Nobles possesses, it is difficult to imagine how he got this far"; and (5) "Nobles Suspected in Fraud!" and "Hawaiian Air president, Bruce Nobles, is the prime suspect in an alleged fraud which took place in 1991."

■■■ The first two statements, referencing the Nazis and Soviets, are simply "rhetorical hyperbole" protected by federal labor laws. *See Letter Carriers*, 418 U.S. at 286, 94 S.Ct. 2770. The second two statements, commenting on Nobles' competence and people skills, are opinions also protected by federal labor laws. *See id.* at 284, 94 S.Ct. 2770; *San Antonio Comm. Hosp.*, 125 F.3d at 1237. Konop did not forfeit his protection under the Railway Labor Act, as Hawaiian suggests, simply by publishing statements that were critical of and insulting to Nobles. " '[F]ederal law gives a union license to use intemperate, abusive, or *insulting* language without fear of restraint or penalty....' " *San Antonio Comm. Hosp.*, 125 F.3d at 1235 (quoting *Letter Carriers*, 418 U.S. at 283, 94 S.Ct. 2770) (emphasis added); *see also Linn*, 383 U.S. at 58, 86 S.Ct. 657 ("[R]epresentation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions.").[11]

■■■ With respect to the final challenged statement, indicating that Nobles was suspected of fraud, Hawaiian fails to argue or present any evidence that Konop published the statement with knowledge of

its falsity or with reckless disregard for the truth. Federal labor law protects even false and defamatory statements unless such statements are made with actual malice—*i.e.*, knowledge of falsity or with reckless disregard for the truth. *See Letter Carriers*, 418 U.S. at 281, 94 S.Ct. 2770; *Linn*, 383 U.S. at 61, 86 S.Ct. 657 (protection under labor law existed "even though the statements [were] erroneous and defame[d] one of the parties to the dispute"). With no evidence or argument that Konop acted with actual malice, Hawaiian cannot demonstrate as a matter of law that Konop forfeited his protection under the RLA.

*NLRB v. Pincus Bros., Inc.–Maxwell*, 620 F.2d 367 (3d Cir.1980) (as amended), upon which Hawaiian principally relies, provides little support for Hawaiian's position. In *Pincus Bros.*, the Third Circuit, in considering whether the NLRB abused its discretion by declining to defer to an arbitration award, merely concluded it was "at least arguable" that the employee published a defamatory statement known to be false. *Id.* at 376. For Hawaiian to prevail on summary judgment, however, it must do more than show it is "at least arguable" that Konop knew the challenged statement was false. It must demonstrate this as a matter of law. As Hawaiian presents no evidence or argument that Konop acted with the requisite malice, Hawaiian falls short of satisfying this burden.

■■ Accordingly, we find that Konop has raised a triable issue of fact with respect to whether the development and maintenance of his website constituted protected activity under the RLA.

---

**11.** We recognize that some organizing activity may be "so flagrant, violent or extreme" or so "egregious," "opprobrious," "offensive," "obscene" or "wholly unjustified" that it loses the protection of the RLA. *See Reef Indus. v. NLRB*, 952 F.2d 830, 837 & n. 19 (5th Cir. 1991) (per curiam); *Timekeeping Sys., Inc. & Lawrence Leinweber*, 323 N.L.R.B. 244, 248–

50 (1997). It is not clear whether Hawaiian is contending that Konop's conduct falls within one of these more amorphous standards. Assuming Hawaiian does so contend, we nevertheless find Hawaiian has failed to demonstrate that, as a matter of law, Konop's activities were so intolerable as to lose their protection under the RLA.

## C. Specific Violations

Konop argues that Hawaiian managers: (1) interfered with Konop's organizing efforts by viewing the website under false pretenses, (2) wrongfully supported one labor group in favor of another by informing the opposing labor faction of the website's contents, and (3) engaged in coercion and intimidation by threatening to sue Konop for defamation, all in violation of the RLA. Hawaiian argues, and the district court agreed, that Konop failed to present sufficient evidence to withstand summary judgment on these claims. We disagree.

### 1. Access of Website

■■■ Konop argues that Davis interfered with Konop's organizing efforts by viewing the website under false pretenses. Absent a legitimate justification, employers are generally prohibited from engaging in surveillance of union organizing activities. *Cal. Acrylic Indus. v. NLRB*, 150 F.3d 1095, 1099–1100 (9th Cir.1998). The reason for this general proscription is that employer surveillance "tends to create fear among employees of future reprisal" and, thus, "chills an employee's freedom to exercise" his rights under federal labor law. *Id.* at 1099.

In *NLRB v. Unbelievable, Inc.*, 71 F.3d 1434 (9th Cir.1995), we upheld the Board's finding that the employer "engaged in unfair labor practices by eavesdropping on private conversations between .employees and [a] Union representative," which occurred in the employee break room. *Id.* at 1438–39. We see no principled distinction between the employer's eavesdropping in *Unbelievable* and Hawaiian's access of Konop's secure website.

■■■ Hawaiian suggests that Davis had a legitimate reason to access Konop's website—to identify and correct any false or misleading statements. Assuming such a concern could justify Davis' monitoring of private union organizing activities, Hawaiian has presented little evidence to suggest that any statements on Konop's website were actually defamatory. Moreover, as discussed below, there are triable issues whether Hawaiian used information it obtained from the website to assist one union faction over another, and to coerce and intimidate Konop. Under these circumstances, we conclude that Konop has raised a triable issue that Hawaiian's access of Konop's website was not justified.

■■■ Hawaiian also argues that Davis' access did not violate the RLA because it did not appreciably limit Konop's organizing activities. Hawaiian emphasizes that, after learning about Davis' access to the website, Konop restricted access for a mere half-day and declined to temper the language in his articles. Hawaiian, however, presents no authority indicating that employees subject to surveillance or eavesdropping must also demonstrate that they consequently limited their organizing activity. It is the *tendency* to chill protected activities, not the actual chilling of protected activities, that renders eavesdropping and surveillance generally objectionable under federal labor law. *See, e.g., Cal. Acrylic*, 150 F.3d at 1099–1100. That a hardy individual might continue his organizing activities undeterred, despite an employer's surveillance, does not render the employer's conduct any less of a violation.[12]

Accordingly, we find that Konop has raised a triable issue of fact that Hawaiian interfered with Konop's union organizing activity in violation of the RLA by accessing Konop's website.

---

**12.** Hawaiian also presents this argument to defeat the other two alleged RLA claims discussed in the following sections. We find it is no more persuasive in the context of those claims.

## 2. Disclosure to Opposing Union

 Konop argues that Nobles unlawfully assisted Reno Morella, the union leader who supported the concessionary contract, by disclosing the contents of Konop's website. Generally, the RLA prohibits employers from providing assistance to a union or labor faction. *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1009 (9th Cir.1990) (per curiam); *see also NLRB v. Finishline Indus.*, 451 F.2d 1280, 1281–82 (9th Cir.1971) (NLRA prohibits employer from telling workers to withdraw from one union and join another); *NLRB v. L. Ronney & Sons Furniture Mfg. Co.*, 206 F.2d 730, 734–35 (9th Cir.1953) (NLRA prohibits employer from initiating membership drive among his employees for employer-favored union).

Konop argues that Nobles disclosed useful intelligence to a rival union faction in an effort to ensure that Konop's faction, which opposed the concessionary contract, would not prevail. Hawaiian does not seriously dispute that disclosure of the contents of Konop's website to Morella would constitute improper assistance. Instead, Hawaiian argues that Konop failed to present sufficient evidence that Nobles made any such disclosure or that Nobles was even familiar with the contents of Konop's website when he spoke to Morella.

Morella, however, states in his declaration that Nobles contacted him on December 14, 1995 and informed him "that he had just reviewed information which was posted on an internet communications system operated by Hawaiian Airlines Pilot Robert Konop." In addition, Morella states that Nobles also "disclosed to me that Konop's internet communications system contained a third written article concerning Konop's efforts to obtain union representation by a labor organization other than the Air Line Pilots Association." This evidence creates a genuine issue of fact whether Nobles was familiar with the contents of Konop's website and whether Nobles disclosed the contents of the website to Morella.

Moreover, Nobles confirmed in his declaration that he contacted Morella because he "felt that Reno Morella, the Chairman of the ALPA Master Executive Council, should be aware of the newsletter because of its inaccurate attack on the proposed labor agreements and the unfair effect it could have on the ratification process." Nobles thus effectively concedes that he interceded to help ensure that Morella's faction—which favored ratification of the concessionary contract—would prevail over Konop's faction, which opposed the agreement.

Accordingly, we find that Konop has raised a triable issue of fact whether Nobles improperly assisted one union faction over another in violation of the RLA.

## 3. Threat of Defamation Suit

 Konop argues that Nobles engaged in unlawful coercion and intimidation by threatening to file a defamation suit against Konop based on statements on Konop's website. An employer's filing or threatened filing of a lawsuit against an employee concerning union organizing activities may, under certain circumstances, violate the RLA. *See, e.g., Diamond Walnut Growers, Inc. v. NLRB*, 53 F.3d 1085, 1089–90 (9th Cir.1995) (finding employer's defamation lawsuit against union violated NLRA); *GHR Energy Corp.*, 294 N.L.R.B. 1011, 1014 (1989) (analyzing whether employer's threat to sue employee for defamation violated NLRA), *aff'd*, 924 F.2d 1055 (5th Cir.1991).

 Hawaiian does not argue that Nobles would be justified in threatening to sue Konop for defamation. Instead, Hawaiian contends that Konop failed to present sufficient evidence that Nobles ever made such a threat. Nobles stated in his

declaration that he "did mention to Morella that the gross inaccuracies and lies in the newsletter made by Konop amounted to defamation," but that he "never said that[he] intended to file a lawsuit against Konop."

Morella, however, indicates otherwise. Morella states in his declaration, "Nobles advised me that Konop should be cautioned, or informed, of the possibility of a defamation lawsuit by Nobles." Morella also testified, "[I]t was my impression and conclusion that Nobles intended for me to contact Konop, or take other action, for the purpose of opposing Konop's efforts to seek alternative union representation." Morella then "informed Konop of Mr. Nobles' statements ... regarding caution with respect to a possible lawsuit against Konop for defamation." Konop confirms the same in his declaration. This evidence is sufficient to raise a triable issue of fact whether Nobles threatened to sue Konop for defamation.

Accordingly, we find that Konop has raised a triable issue of fact whether Nobles engaged in coercion and intimidation in violation of the RLA by threatening to sue Konop for defamation.

### D. Bench Trial on Retaliation Claim

■ Konop's retaliation claim under the RLA was tried to the district court. The district court entered judgment against him on this claim, which involved his allegation that Hawaiian violated the RLA when it placed him on sick leave in retaliation for protected labor activities. Konop challenges the district court's judgment on this claim on the ground that his subpoenas for corroborating witnesses were improperly quashed. We review a district court's order quashing subpoenas for an abuse of discretion. *United States v. Berberian*, 767 F.2d 1324, 1324 (9th Cir.1985). A litigant whose subpoenas have been improperly quashed must also show prejudice. *See Casino Foods Corp. v. Kraftco Corp.*, 546 F.2d 301, 302 (9th Cir.1976).

■ There is some dispute whether the district court's remarks in a pretrial hearing constituted an order to quash subpoenas at all. Assuming, however, that the district court did quash Konop's subpoenas, Konop has not suggested what relevant evidence the subpoenaed witnesses might have provided had they been compelled to testify. Konop has consequently failed to show that he was prejudiced. Accordingly, the district court's judgment against Konop on his retaliation claim under the RLA is affirmed.

### CONCLUSION

For the foregoing reasons, we affirm the district court's judgment with respect to Konop's Wiretap Act claims and his retaliation claim under the Railway Labor Act. We reverse the district court's judgment on Konop's Stored Communications Act claims and his claims under the Railway Labor Act for interference with organizing activities, wrongful support of a union faction, and coercion and intimidation.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

REINHARDT, Circuit Judge, concurring in part, dissenting in part.

I concur in Part C of Section I of the majority opinion regarding Konop's claims under the Stored Communications Act, and Section II of the majority opinion regarding Konop's claims under the Railway Labor Act. I dissent, however, from Part B of Section I, which holds that the term "intercept" in the Wiretap Act, as applied to electronic communications, refers solely to *contemporaneous* acquisition. I conclude instead that "stored electronic

communications" are subject to the statute's intercept prohibition as well.

Because I recognize that any reading of the relevant statutory provisions raises some difficulties and introduces some inconsistencies, the question becomes: which reading is more coherent and more consistent with Congressional intent? The majority reasons, and I agree, that stored electronic communications are covered under the definition of "electronic communications" in the Wiretap Act. However, having made that determination, the majority proceeds to introduce unnecessary confusion and incoherence into the statute by holding that "intercept" encompasses only *contemporaneous* acquisition of electronic communications, and thus that it is not possible to "intercept" a stored electronic communication. We have already rejected just such a contemporaneity requirement with respect to the acquisition of stored wire communications, and there is no justification for reviving it with respect to stored electronic communications. *United States v. Smith*, 155 F.3d 1051, 1057 n. 11, 1058 (9th Cir.1998).

The contemporaneity requirement for interception first appeared in *United States v. Turk*, 526 F.2d 654 (5th Cir.1976), in which the Fifth Circuit held that the definition of "intercept" in the statute "require[s] participation by the one charged with an 'interception' in the *contemporaneous* acquisition of the communication through the use of [a] device." 526 F.2d at 658 (emphasis added). In *Turk*, however, the Fifth Circuit was interpreting a version of the Wiretap Act that predates the one at issue in *Smith* and in this case. That version did not cover interception of

stored wire communications or of electronic communications at all. The statute was subsequently amended to include electronic communications, stored electronic communications, and stored wire communications in 1986.[1] Electronic Communications Privacy Act. Pub.L. No. 99–508. 100 Stat. 1848. Thereafter, in *Smith*, 155 F.3d 1051, 1057 n. 11, 1058 (9th Cir.1998), this court held, in a case involving the acquisition of stored voicemail messages, that *Turk's* contemporaneity requirement had been "statutorily overruled;" at least with respect to wire communications, by the changes in the statute which brought *stored* wire communications within its purview. The *Smith* court reasoned that "intercept" must necessarily include non-contemporaneous acquisition of stored wire communications because Congress had deliberately inserted stored wire communications into the intercept provision despite the fact that contemporaneous acquisition of stored wire communications is, by definition, impossible. 155 F.3d at 1058. To read "intercept" to include only contemporaneous acquisition would, of course, have rendered the intercept prohibition with respect to stored wire communications meaningless. *Id.*

Here, the majority's definition of "intercept" renders that prohibition meaningless with respect to stored electronic communications. The majority opinion would result in eliminating stored electronic communications from the purview of the intercept prohibition altogether, because a stored communication cannot be acquired contemporaneously with its transmission—it has already been transmitted.

---

1. The statute was again recently amended, this time to repeal the inclusion of stored wire communications in the definition of wire communication. Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, Pub.L. No. 107–56, § 209, 115 Stat. 272, 283 (enacted October 26, 2001). However we apply here the version that was in effect at the time of the acts in question, Electronic Communications Privacy Act. Pub.L. No. 99–508. 100 Stat. 1848.

The majority's reading of the statute simply doesn't work: while explicitly holding that stored electronic communications are within the term "electronic communications" and that the intercept prohibition of the Wiretap Act applies to electronic communications, it also explicitly holds that interception of electronic communications is limited to contemporaneous acquisition, thereby *simultaneously* including and excluding stored electronic communications from the intercept prohibition.

To read a contemporaneity requirement into the definition of "intercept" renders the prohibition against the electronic communication interception largely superfluous, and violates the precept against interpreting one provision of a statute to negate another. *See e.g., Sorenson v. Secretary of the Treasury*, 475 U.S. 851, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986) (applying the whole act rule to the Omnibus Budget Reconciliation Act of 1981). Intercept of electronic communications is defined as any "acquisition of the contents of any ... electronic ... communication through the use of any ... device." 18 U.S.C. § 2510(4). The nature of electronic communication is that it spends infinitesmal amounts of time "en route," unlike a phone call. Therefore, in order to "intercept" an electronic communication, one ordinarily obtains one of the copies made en route or at the destination. These copies constitute "stored electronic communications," as acknowledged by the majority. 18 U.S.C. § 2510(17)(A)(" 'electronic storage' means ... any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof"). If intercept is defined as solely contemporaneous acquisition, then in contravention of Congressional intent, at most all acquisitions of the contents of electronic communications would escape the intercept prohibition entirely. Jarrod J. White, Commentary, E-Mail@Work.Com: Employer Monitoring of Employee E-Mail, 48 *Ala. L.Rev.* 1079, 1083 (1997) ("Following the Fifth Circuit's rationale, [and excluding stored electronic communications from the intercept prohibition] there is only a narrow window during which an E-mail interception may occur—the seconds or milliseconds before which a newly composed message is saved to any temporary location following a send command. Therefore, ... [assuming that stored communications are excluded from the intercept prohibition], interception of E-mail within the prohibition of the ECPA is virtually impossible.").

The majority asserts that it is reasonable that the term "intercept" would describe different conduct with respect to wire communications than with respect to electronic communications because different actions are required to intercept different kinds of communications. This reasoning fails because, although wire communications and electronic communications are quite different, stored wire communications are technologically equivalent to stored electronic communications. Thus it would make little sense to treat them differently. *See* 18 U.S.C. § 2510(1) (defining "wire communication" as including "any *electronic storage* of[wire] communication"). While Congress may not always act sensibly, there is no reason for the majority to presume that it failed to do so in this instance.

### The Non–Contemporaneous Acquisition Reading Permits a Coherent Reading of the Wiretap Act and the Stored Communications Act Together, Consistent with Congressional Intent

Congress's clear intent, when amending the statute in 1986, was to regulate *access to* and *acquisition of* stored electronic communications. *See* S.Rep. No. 99–541 at 3–4 (1986), reprinted in 1986 U.S.C.C.A.N.

3555, 3557–8 (discussing Congressional intent to cover email and computerized recordkeeping systems). The majority's interpretation of the Wiretap Act depends in part on a tortured reading of the Stored Communications Act under which "access to" a communication is equated with "acquisition of" a communication, contrary to clear statutory language. Sections 2701 and 2703 of the Stored Communications Act regulate "access" to facilities where communications are stored and "access" to the communications themselves. The majority, relying on *Steve Jackson Games, Inc. v. United States Secret Serv.*, 36 F.3d 457, 463 (5th Cir.1994) somehow reads these provisions as being analogous to the "intercept" provisions of the Wiretap Act. 236 F.3d at 1044. However, "access" is more properly understood as being *qualitatively* different from "intercept," not *temporally* different, and as constituting a lesser included offense of "intercept." The "access" prohibitions in § 2701, in contrast to those regarding "interception" in § 2511, do not mention at all "acquisition" of the "contents" of any communication, but only "access," authorized and unauthorized, to them. "Access" is not defined in the statute, and therefore courts must apply the ordinary or technical meaning that the word has in the context of electronic communications. "Access" is defined in the Oxford English Dictionary as "[t]he habit or power of getting near or into contact with; entrance, admittance, admission (to the presence or use of) [noun]" and "[t]o gain access to (data, etc., held in a computer or computer-based system, or the system itself) [transitive verb]." As discussed above, "intercept" is defined in the statute as the actual acquisition of the contents of a communication. Given the plain language of the statute, the difference between the prohibition in 18 U.S.C. § 2511 ("intercept") and 18 U.S.C. § 2701 ("access") becomes more than semantic; it indicates that Congress intended that *only*

18 U.S.C. § 2511 prohibit the actual *acquisition* of the contents of a communication.

On the other hand, section 2703 (the structure of which the panel claims supports a "contemporaneous acquisition" reading of the text) sets out the parameters under which governmental authorities can gain "access" to the "contents" of stored electronic communications. That section provides that governmental authorities may obtain a search warrant to compel electronic communication service providers to disclose the contents of stored electronic communications. By its plain terms, it does not provide a judicial means by which government authorities can *independently* intercept or acquire the contents of electronic communications. That is covered under 18 U.S.C. § 2516. Having excluded stored electronic communications from the Wiretap Act, the majority is forced to torture the statutory language of the Stored Communications Act in order to craft a reading of the statutes which accomplishes Congress's intent of establishing procedures by which governmental authorities may directly acquire the contents of stored electronic communications. A reading of the Wiretap Act which includes stored electronic communications under the intercept prohibition provides a plain answer—one that does not require linguistic gymnastics.

Furthermore, contrary to the arguments of Hawaiian Airlines and its amici, the drafting of a separate act specifically governing the contents of stored electronic communications (Stored Communications Act. 18 U.S.C. §§ 2702–03) was necessary, *even though* stored communications were included in the Wiretap Act. First, the damage caused by computer hackers (also known as "electronic trespassers") was a major concern of Congress in enacting the Electronic Communications Privacy Act and the Stored Communications Act. The

separate provisions prohibiting unauthorized access were found necessary, in addition to the pre-existing prohibitions on interception, because computer hackers often do a great deal of damage to stored communications facilities and stored communications without ever acquiring the contents of those communications. *See United States v. Smith*, 155 F.3d 1051, 1058–59 (9th Cir.1998) (explaining that the Stored Communications Act permits penalties against hackers who put themselves in the position to acquire a communication, but the Wiretap Act penalizes those who go further and acquire the communication); *In re DoubleClick, Inc. Privacy Litigation*, 154 F.Supp.2d 497 at 507(S.D.N.Y. 2001) (finding that Title II of ECPA was aimed at computer hackers); *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F.Supp.2d 817, 820 (E.D.Mich.2000) (explaining that the general purpose of the ECPA was to create a cause of action against computer hackers.); *State Wide Photocopy, Corp. v. Tokai Financial Services, Inc.*, 909 F.Supp. 137, 145 (S.D.N.Y.1995) ("[T]he ECPA was primarily designed to provide a cause of action against computer hackers...."). Hackers often use their unauthorized access to disrupt or prevent authorized access of others to stored communications facilities. *See* 18 U.S.C. § 2701 (prohibiting obtaining, altering or preventing access to wire or electronic communications without authorization). Moreover, the activities of hackers, and the mere potential that they could acquire the contents of electronic or wire communications in storage, create an atmosphere of anxiety in which computer users do not feel confident about the confidentiality of their communications, and productivity is hampered. These were all major concerns of Congress in enacting the Stored Communications Act, concerns which necessitated the drafting of a separate act even though stored electronic communications were already included under the definition of electronic communications.

Second, it is in the nature of electronic communication to be stored (both temporarily and permanently, as Congress indicated in the definition of electronic storage, 18 U.S.C. § 2510(17)), and it is in the nature of the electronic communications industry that electronic communications service providers (defined in 18 U.S.C. § 2510(15)) have possession and control over large amounts of stored electronic communications. Therefore, electronic communications service providers would be an obvious source for law enforcement authorities who seek to obtain the contents of electronic communications. Recognizing that compelling disclosure by these entities would be one means by which government authorities might seek to obtain the contents of communications, Congress added a section setting out the procedures for compelling such disclosure. Michael S. Leib, E Mail and the Wiretap Laws: Why Congress Should Add Electronic Communication to Title III's Statutory Exclusionary Rule and Expressly Reject a "Good Faith" Exception, 34 *Harv. J. on Legis.* 393, 414 (1997). There is no analogous storage of wire communication by wire communication service providers (i.e., telephone companies, also included under 18 U.S.C. § 2510(15)) such that guidelines would be needed on how governmental authorities could compel disclosure of stored wire communications from them.

Third, the Stored Communications Act is necessary to police the unauthorized access to electronic and wire communications facilities that is a necessary antecedent to illegal interception of those communications in storage. Were Congress to prohibit only actual acquisition of the contents of communications in storage, law enforcement would be powerless to do anything about persons who gained unauthorized

access in preparation for interception (i.e., the acquisition of the contents of communications) until such persons had actually accomplished their unlawful mission. Further, because acquisition of the contents of an electronic communication in storage, or a wire communication in electronic storage does not disturb the "original" copy of such communication, actual acquisition of these communications is likely to be much more difficult to detect and prove than unauthorized access to a facility. Therefore it is helpful to law enforcement to have in its arsenal a separate provision governing access.

In sum, a reading of the Wiretap Act that includes stored electronic communications in the statute's "intercept" prohibition is consistent with the nature of the technology at issue, leaves no unexplained statutory gaps, and renders none of the myriad provisions of either the Wiretap Act or the Stored Communications Act superfluous. Under such a reading, the Wiretap Act would prohibit the interception of electronic communications, both stored and en route, and subject violators to serious penalties. It would permit law enforcement to intercept such communications using a court order as indicated in § 2516. (Whether or not it would preserve the use of other less savory techniques is a matter this court is not called upon to decide.) A court order can be obtained by state prosecutors in connection with any one of a number of enumerated crimes, and by any assistant United States attorney for the investigation of any federal felony. Wire communications are treated similarly with only minor excep-

tions (for example, authorization to intercept wire communications is only available for a finite, though extensive, list of federal crimes); this reading, consistent with Congressional intent as revealed in the legislative history of the statute, rejects the idea that stored electronic communications are afforded a lesser degree of protection from interception than stored wire communications.[2]

### Prior Precedent on the Wiretap Act and the Stored Communications Act Does Not Preclude the Non–Contemporaneous Acquisition Reading

This is a case of first impression in this circuit, and there is no binding authority on the regulation of stored electronic communications. There are no Supreme Court cases interpreting the provisions of the Wiretap Act and the Stored Communications Act as they relate to electronic communications, and the court of appeals decisions, in our circuit and others, either do not deal with stored electronic communications, or are superseded by changes in law and technology, or both. *United States v. Turk* predates the addition of the electronic provisions and language to the statute, and therefore is of little relevance. 526 F.2d 654 (5th Cir.1976). More important, its contemporaneity requirement was expressly repudiated in *United States v. Smith*. 155 F.3d 1051, 1057 n. 11, 1058 (9th Cir.1998) ("[T]o the extent that *Turk* stands for a definition of "intercept" that necessarily entails contemporaneity, it has ... been statutorily overruled."). *Steve Jackson Games* is the only circuit court

---

**2.** In its interpretation of the term "intercept," the majority relies in part on legislative history from the USA Patriot Act. As the Supreme Court has cautioned, however, " 'the *views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier* one.' " *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051,

64 L.Ed.2d 766 (1980)(quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)). Such subsequent legislative history will "rarely override a *reasonable interpretation* of a statute that can be gleaned from its language and legislative history prior to its enactment." *Id.* at 118 n. 13, 100 S.Ct. 2051 (emphasis added).

case that involves stored electronic communications. As discussed above, the Fifth Circuit's reasoning is flawed, as it fails to consider the difference between "access" 18 U.S.C. § 2701 and "intercept" 18 U.S.C. § 2511 and erroneously conflates the terms, reading them both to refer to the acquisition of the contents of a communication. 36 F.3d at 463. Moreover, *Steve Jackson Games* is rendered somewhat obsolete by the growth of the Internet, a phenomenon that the judges deciding that case could not have meaningfully incorporated into their reading of the statute. In particular, it would have been impossible to anticipate the expectations of privacy that people would develop regarding the Internet, expectations that are crucial to interpreting the statutory scheme consistent with Congressional intent to protect privacy interests. The other cases cited by the majority are district court cases, not binding on this court; they also have little persuasive value because they rely on the flawed reasoning of *Steve Jackson Games* and on the contemporaneity requirement that this court has rejected. *See Wesley College v. Pitts*, 974 F.Supp. 375, 386 (D.Del.1997), *aff'd*, 172 F.3d 861 (3d Cir.1998) (affirmed by the Third Circuit in an unpublished disposition, which therefore has no precedential value); *United States v. Reyes*, 922 F.Supp. 818, 836 (S.D.N.Y.1996); *Bohach v. City of Reno*, 932 F.Supp. 1232, 1236–37 (D.Nev. 1996). Although this court in *United States v. Smith* correctly recognized the access/intercept distinction, our opinion contained unfortunate dicta regarding electronic communications. 155 F.3d 1051 at 1057. Because the case involved wire, not electronic, communications, those statements are not binding upon us.

---

\* This appeal was submitted following oral argument on June 5, 2001, and the panel filed an opinion on September 12, 2001, which is published at 265 F.3d 878 (9th Cir.2001). The mandate was stayed on December 10,

## Conclusion

In conclusion, because I believe that reading the Wiretap Act to prohibit interception of "stored electronic communications" provides a more coherent construction of the Act and is more consistent with the text of the statute as well as with the Congressional intent underlying both the Wiretap Act and the Stored Communications Act, I respectfully dissent from Part B of Section I of the majority opinion.